# EXHIBIT A

# ARBITRATION AWARD

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
In the Matter of Arbitration between:       \*
                                            \*
UNITED STEELWORKERS, GMP COUNCIL,    \* FMCS Case No. 20-0722-08309
LOCAL 36M,                                  \*
                          Union              \*
and                                         \*: Issue: Douglas Wood - Termination
                                            \*
ITT ENGINEERED VALVES,               \*
                          Employer           \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| Impartial Arbitrator: | William W. Lowe |
| Place & Date of Hearing: | Virtual Hearing (Zoom) October 23, 2020 |
| Appearances for Union: | Bennett Sallemi, USW, GMP Council V. P., Advocate<br>Brendan Bohan - USW, GMP Council, Local 36M, President (Witness)<br>Douglas Wood – Former Lean Technician, ITT Engineered Valves ("ITT EV"), (Grievant) |
| Appearances for Employer: | Glen Doherty, Esq., Counsel for ITT EV, Attorney-Advocate<br>Jason Greenwood, Human Resources Manager, ITT EV, Witness<br>Kadeem Bhaila, Site Operations Manager, ITT EV, Witness |
| Proceedings: | Grievance filed June 23, 2020.  Witness sworn, not sequestered. No transcript; hearing recorded.  Record closed November 30, 2020, with receipt of post-hearing briefs. |
| Date of Award: | December 28, 2020 |

## UNITED STEELWORKERS, GMP, LOCAL 36M

## AND

## ITT ENGINEERED VALVES

## GRIEVANCE: DOUGLAS WOOD TERMINATION

## ISSUE

The central issue in this grievance, as put forth by the Employer, is as follows:

> *Whether the Grievant, Douglas Wood, was terminated for Just Cause when he wrote "Fuck Sri Lanka" on his face mask and displayed it to co-workers and/or threatening a manager from Sri Lanka.  If not, what shall the remedy be?*

The Union put forth a slightly different issue as follows:

1.  *Did the Employer demonstrate a violation of an intolerable act under Factory Rule #3, violation of the [Corporate] Code of Conduct, [as] well as proving Unlawful Harassment to justify termination of the Grievant, Doug Wood?  If not, what shall the remedy be?*

2.  *If the Employer has sustained its burden of demonstrating a shop rules violation, has it demonstrated just cause for discharge?  If not, what shall the remedy be?*

The issue reduced to its simplest terms is as follows:

> *Based on Douglas Wood's actions at ITT EV on June 9, 2020 when he wrote "Fuck Sri Lanka" on his mask and wore it in his work area for a period of time and allegedly threatened his Sri Lankan Site Operations Manager, did the Employer have just cause for Wood's discharge on June 23, 2020?  If not, what shall the remedy be?*

## BACKGROUND AND FACTS

      The grievant, Douglas Wood ("Grievant" or "Wood") had been a Lean Technician serving under the supervision of second shift supervisor, Brad Myer, at the time of the incident on June 9, 2020.  Wood had been an employee of ITT Engineered Valves ("ITT EV") for just over two years having been hired on May 14, 2018.  As a Lean Technician, Wood, among other duties, had a primary duty of polishing valves produced by the Company.  The incident resulting in

Wood's termination occurred on Friday, June 9, 2020, in the late afternoon when Wood was talking with a fellow Lean Technician, Tim Donnelly ("Donnelly"). Donnelly had his face mask pulled down at the time while the two were conversing. The Site and Operations Manager, Kadeem Bhaila ("Bhaila"), the employees' second line supervisor and native of Sri Lanka, came by and noticed Donnelly's face mask was pulled down and advised him that because of safety precautions regarding Covid-19, he needed to have his face mask pulled up over his lips and nose, per company policy. Wood interjected, at that time, that he had served our country in the military and that personally he didn't object to Donnelly's face mask being down.

Bhaila, during his direct testimony, said he thanked Wood for his service, but advised that his primary concern was for employee safety and that the masks needed to be in place and then left the two employees. Wood, felt that his service in the military had been disparaged by Bhaila's comment. Wood testified that Bhaila's comment back to him indicated that he (Bhaila) didn't care about Wood's service to the country. Wood apparently became so disenchanted by Bhaila's alleged comment, that he proceeded to return to his booth and admitted that he wrote on his mask, "Fuck Sri Lanka." An employee, unnamed at the hearing, but listed in Union Vice President Franklin Snyder's interview notes prepared by HR Manager Jason Greenwood (Employer Exhibit No. E-4) as Lean Technician Travis Joseph, reported that something vulgar was written on Wood's face mask but couldn't make out exactly what was written. Wood later confirmed that he had written on the mask, "Fuck Sri Lanka" because he believed Bhaila had belittled his military service.

Brad Myers ("Myers") the 2nd shift supervisor, and Wood's immediate supervisor that day allegedly conveyed to HR Manager Jason Greenwood ("Greenwood") during his interview, that Wood was yelling and dropping F-bombs in the polishing area complaining about Bhaila.[1] Myers told Greenwood that, he recalled seeing "Fuck" written across the mask, but could not make out the rest. He then provided Wood a new mask, and the mask with the profanity was not seen again. Myers took Wood to his office and they spoke for approximately thirty (30)

---

[1] Supervisor Brad Myers was not present for testimony at the hearing as he had been discharged from ITT EV for a similar offense since Wood's termination.

minutes.  Later, in a June 17th meeting with Greenwood and Production Manager, Kerry Smith, Wood admitted to writing "Fuck Sri Lanka" on his mask.

According to Wood's testimony, while at Myers's office, Myers asked Wood to calm down, and he did.  They discussed the conversation Wood and Bhaila had, and after they discussed the matter for some time, Wood asked to take some leave to be able to then return to work with a clean slate.  Wood also testified that, during their meeting, he apologized to Myers for his conduct believing he may have acted improperly with Bhaila and testified he later apologized to Bhaila during a meeting he attended on his suspension.  Wood testified that as he left the meeting with Myers, the two shook hands, and he (Wood) believed the matter had been settled.  During his testimony, Wood also testified that he never received any prior discipline during his tenure at ITT EV.  Wood also testified that he never walked around the facility "showboating" the mask, but stayed in his work area on the shop floor.  He also testified that he had the mask on for about 10-15 minutes while he was in his work area.

The Human Resources Manager, Jason Greenwood ("Greenwood") testified that he had worked at ITT EV for six (6) years and had been in Human Resources ("HR") for most of that time having been promoted to HR Manager in March 2020.  Greenwood testified about Joint Exhibit No. J-2, Shop Rules and Regulations for ITT EV for Hourly Employees testifying that the rules provide for termination of employees for immoral or indecent conduct which is characterized as an Intolerable Act in the Shop Rules and Regulations.  He also testified about Joint Exhibit No. J-4, the ITT Code of Conduct which is distributed to employees and serves as a reference guide on how to work together and guides decision-making within the Company. The Code states that violations of the Code can result in disciplinary actions up to and including termination.  It also discusses a harassment-free workplace and cautions employees not to participate in harassment.  Greenwood testified that J-4 applies to all ITT employees, and that each employee is provided a copy of the Code on his/her first day of ITT employment along with training, as appropriate.

Greenwood also testified regarding Employer Exhibit No. E-2, ITT's Global Corporate Policy entitled Harassment, Discrimination and Retaliation Prevention Policy, to which the

Union objected.  Local Union President Brendan Bohan testified he had never seen nor been provided the policy.  Despite the Union's objection the policy was admitted into evidence as a business document.  Greenwood testified that the Policy defines prohibited behavior and provides corrective measures up to and including termination for violation of the policy and that it applied to all ITT employees.  Greenwood further testified that the ITT EV provides training on these policies and that he (Greenwood) provided the training in 2019 to ITT EV employees, including Wood.

Greenwood also testified regarding Employer Exhibit No. E-1, ITT Code of Corporate Conduct Acknowledgement of Receipt that Wood signed acknowledging he received a hard copy (or was provided internet access for a copy) on May 14, 2018, his first day of employment. The Union objected to the introduction of E-2 (ITT Policy on Harassment, Discrimination and Retaliation) but it was allowed into evidence.  Greenwood testified on E-3, ITT EV Training Report, dated December 4, 2019, which acknowledged Wood's receipt of Code of Conduct training and Harassment Prevention training which Greenwood conducted and which Wood attended.  Thus, Wood should have been aware of the ITT policy on harassment.

Testifying regarding the incident at issue, Greenwood advised that ITT employee Chris Eberly had informed him of the incident involving Wood and his facemask on June 10, 2020, and his throwing of a fit on the shop floor following the discussion with Bhaila.  As a result, Greenwood initiated an investigation which involved the interview with Second Shift supervisor Brad Myers; Operations & Site Manager Kadeem Bhaila; Local Union V.P. Franklin Snyder; Union Recording Secretary Tony Padilla; Lean Technician Tim Donnelly; Lean Technician Travis Joseph; and Lean Technician and Grievant Douglas Wood.  These interviews were documented (both in handwritten and typed form) and introduced into evidence as Employer Exhibit No. E-4.  While most of the interviews were conducted on June 10th, the day immediately following the incident, the interviews with Wood could not be held until his return to duty following the leave granted him by Myers.  Also, the Local Union President, Brendan Bohan, asked that he be able to talk with Greenwood's supervisor, Steven Haddad, before any official action was taken, and then Bohan was on sick leave for a day which delayed the disciplinary determination/action.  Greenwood testified he wanted Bohan present when he

interviewed Wood.  Thus, Wood was not interviewed until June 17, 2020.  Wood was then suspended on June 17, 2020, pending further corporate review of the incident.  Following that corporate review, Wood was terminated on June 23, 2020.

Greenwood testified, and his interview notes supported, that in supervisor Myers's discussion with Wood on June 9, 2020, immediately after the incident, Myers asked Wood what he could do to make Wood feel better, and Wood replied, "A one-on-one meeting with Kadeem (Bhaila) with no consequences" which management characterized as a physical threat.

Greenwood, in his interview with Tim Donnelly, the Lean Technician who Wood was conversing with when Bhaila made his comment about the wearing of masks and safety, asked Donnelly whether Bhaila had said anything derogatory during his June 9th discussion with Donnelly and Wood about wearing a mask for safety.  Donnelly replied that Bhaila said nothing derogatory during that meeting.

Greenwood also testified and introduced into evidence, Employer Exhibit No. E-5 which is a Notice of Determination on Wood's request for Unemployment Benefits.  The Union objected on the basis that the Unemployment case had no bearing on the termination of Wood. The exhibit was admitted into evidence with the understanding that it would likely be given little weight in the matter by this arbitrator.

Management's second witness was Kadeem Bhaila ("Bhaila"), the Site & Operations Manager and Wood's second line supervisor.  Bhaila, who had been with ITT EV for 14 years – 8 years in his current position, testified regarding the incident.  He testified that he never said anything derogatory about Wood's military service, only that he believed in safety first and that masks must be worn when employees were within six feet of each other.  Contrary to Wood's testimony, Bhaila said he thanked Wood for his military service, but advised Wood that was not his concern in this instance, but that employee safety was his primary concern.  Bhaila testified that the day after the incident which occurred on June 9, 2020, Bhaila discussed with Myers what had occurred during the incident with Wood and Donnelly.  Myers advised Bhaila that the prior discussion/incident between him, Donnelly and Wood had very much upset Wood.

Bhaila then testified that either the Thursday or Friday after the incident (either June 11th or 12th) Greenwood interviewed him about the incident.  Greenwood advised Bhaila that he was recommending the suspension of Wood although he had not spoken to Wood at that time as he was on leave.  However, after speaking with Wood and Production Manager Kerry Smith on June 17th and Wood admitting he wrote, "Fuck Sri Lanka" on his mask, Greenwood and Smith decided at that time that serious discipline was appropriate for the offense.  Accordingly, on June 17, 2020, after Greenwood's interview with Wood, Wood was issued a suspension pending corporate review of the matter.  Following that corporate review, Wood was terminated effective June 23, 2020.  Wood immediately filed a grievance the same date.  Eventually, a third step grievance meeting was held on July 15, 2020.  The Company's response to the Third Step grievance meeting was that the Shop Rule for Intolerable Acts referred to immoral or indecent conduct, and that ITT's Corporate Code of Conduct stressed having a harassment-free workplace.  The Company determined that Wood's actions were clearly harassing in nature and a violation of the Company's Code of Conduct.  Accordingly, the Company rejected Wood's grievance and determined not to return him to employment at ITT EV.

The Union's first witness was Local President Brendan Bohan ("Bohan") who had been employed with ITT EV for twenty (20) years, seventeen (17) of which were in the Maintenance Department.  He had also served as a union official for nearly his entire time of employment at ITT.  Bohan testified that in his opinion, the management action was flawed.  Initially, the Company suspended Wood on June 17, 2020, for writing on his mask after he admitted to doing so.  Then, without any further incident, the Company terminated Wood's employment six (6) days later for exactly the same infraction.  It is nothing less than double jeopardy for the same incident – both a suspension and then a termination for exactly the same incident.  The Union argued that the Company did not ask for an extension of time when it suspended Wood.  It just came back six days later and terminated him, after adding to the initial details of the violation citing the violation as an Intolerable Act #3 in the Shop Rules as well as a violation of ITT's Code of Conduct under Harassment-Free Workplace.[2]  According to Bohan's testimony, the

---

[2] Both Disciplinary Action Notifications (Joint Exhibit No. J-3) cited "Intolerable Act #3 Immoral or Indecent Conduct/Code of Conduct: Harassment-Free Workplace" in the Type of Violation.  The main difference is that in the second notification (Discharge) there was a sentence deleted from the first notification (Suspension) which stated, "We are suspending Doug,

Company never cited that the initial suspension was provisional, nor did the Company ask for an extension of time or cite extenuating circumstances when it suspended Wood.

In his direct testimony, Bohan testified regarding the termination of John Kise ("Kise"), a former Lean Technician who was terminated in November 2009 for making a racial slur that was considered disrespectful and unacceptable.  However, this was a second offense for Kise who had received a 5-day suspension a year before for a similar offense.  Unlike the Kise termination for a second offense, the June 9th incident with Wood was his first disciplinary action, and he was terminated.  The Union believes there is disparate treatment shown against Wood.  Bohan further testified that while training is provided to bargaining unit employees, it is interactive training, and he considered it "fun-type/jovial" training, not serious training.  Also, Bohan testified that he never was shown the policy on Harassment, Discrimination, and Retaliation Prevention (Employer Exhibit No. E-2) although Employer Exhibit No. E-1 (ITT Code of Conduct Training Acknowledgment) and Employer Exhibit No. E-3 (ITT Training Report, dated December 4, 2019) reflect that the Grievant was aware of the policies and did receive the Code of Conduct and Harassment Prevention training.

Lastly, Grievant Douglas Wood testified in the proceeding that he had received sensitivity training and also training on the shop rules and code of conduct, but does not recall the training as being extensive and does not recall discipline being discussed in the training.  Wood also testified that his termination was his first discipline at ITT EV although, on cross-examination, he admitted that he did receive counseling for an attendance issue as well as for a no-call, no-show incident.  Wood also admitted that he wrote the words, "Fuck Sri Lanka" on his mask at his June 17th interview with Greenwood and Kerry Smith, but that Production Manager Kerry Smith, who signed the suspension letter, never mentioned anything about the possibility of Wood being later terminated for that offense.  Also, on cross-examination, Wood admitted he had received sensitivity training, but that it was basically a film that trainees watched and that

---

pending corporate review of the incident."  In lieu of the previous sentence, the second notification, added three additional sentences – "This is a violation of Intolerable Act #3 in Shop Rules, Immoral or indecent conduct.  It is also a violation of ITT's Code of Conduct under Harassment-Free Workplace.  Effective June 23, 2020 we are terminating Doug's employment with ITT."

the training for the most part was focused on sexual harassment and discrimination.  Wood also testified on cross-examination that he did receive the Code of Conduct document and signed for it although that was two years prior to the incident.  Wood also testified that he did not make a threat to anyone at any time.   However, the Employer considered Wood's response to Supervisor Brad Myers's question of what he'd like to see ["A one-on-one meeting with Bhaila with no consequences"] as a viable threat to Bhaila.


## PERTINENT CONTRACT AND POLICY PROVISIONS

Aside from two provisions in the Collective Bargaining Agreement - Article 4, Management and Article 6 – Grievances and Arbitration – both referenced and cited below, there are no provisions for Discipline in the Collective Bargaining Agreement.  Thus, discipline is referenced and cited in the below policies and Code of Conduct issuances cited below.

### A.  2017-2021 COLLECTIVE BARGAINING AGREEMENT[3]

#### ARTICLE 4
#### Management

1.  All matters concerning or related to the management of the Company and business and administration thereof, and the direction of the working forces, including but not limited to the right to suspend or discharge for cause . . . is vested exclusively in the Company subject only to the terms of this Agreement

#### ARTICLE 6
#### Grievances and Arbitration

1.  All grievances, which may arise regarding the interpretation and application of the provisions of this Agreement, but limited thereto, shall be processed by the co-worker and/or the Union within five workdays of its occurrence, except for unusual circumstances.  If not filed within this period of time, it shall be effectively waived.

    Step 1: - The aggrieved co-worker, with or without his steward, shall endeavor to adjust the complaint verbally with his immediate supervisor.  The supervisor shall give a verbal response to the grievance in not more than five workdays.

    Step 2 – If the grievance is not satisfactorily adjusted by the supervisor, it shall within five work days after the supervisor's decision, be presented to the co-worker's department head by

---

[3] Joint Exhibit No. J-1:  Contract between ITT Engineered Valves, LLC (Lancaster, PA) and Local Union No. 36, Glass, Molders, Pottery, Plastics and Allied Workers International Union, effective May 20, 2017 through May 21, 2021.

an authorized Union Representative.  The department head or his designated representative shall give a written answer within five days.  A Step 2 meeting will be held between the Union and Company to discuss the grievance.

Step 3 – If the grievance is not satisfactorily adjusted in Step 2, it shall be presented to the Manager, Human Resources within five (5) work days after the Step 2 decision.  The Union's International Representative shall contact the Manager, Human Resources in a timely basis to arrange for a meeting.  The grieving co-workers, their Union representatives, and relevant witnesses shall have the right to attend the Third Step Meeting.  All 3rd Step grievances must be answered in writing within five (5) working days.

In the event the co-worker involved and/or Union claim the discharge of a co-worker who has completed his/her probationary period was unjust, such claim must be presented to the Company within three (3) working days of the termination action.

Any extension of time for any step in the process shall be agreed upon by representatives of the Company and the Union and said agreement shall not be unreasonably withheld by either party.

2.      . . . The arbitrator shall decide cases in issue solely upon the specific provisions of this Agreement and shall not have power to amend, modify, alter, or subtract from the Agreement or any provision thereof. . . .

3.      If the Company fails to reply to a grievance in the first or second step within five (5) working days of the grievance being filed and no extension of time has been agreed-upon, the grievance will automatically be processed to the next step of the grievance procedure, provided the grievance is filed by the Union within five (5) working days of the occurrence.  All 3rd step grievances must be answered in writing within five (5) working days.

4.      All disciplinary actions taken against an hourly employee must be in writing and given to both the co-worker being disciplined and the Union within five (5) working days of the disciplinary action.

5.      In the event disciplinary action occurs, a copy of such notice will be given to a Union officer and/or steward.  Disciplinary actions shall be effective within five (5) working days following an investigation of circumstances of the breach of discipline unless extenuating circumstances require additional time.

## B.   ITT SHOP RULES AND REGULATIONS[4]

**Rules and Regulations**

In order to maintain safe and efficient operations, certain rules of conduct for all employees are essential.  Obviously, it is not possible to set up rules to cover all situations or conditions.  However, in accordance with the rules set forth in this booklet by the Company, appropriate disciplinary action will be taken where infractions of rules or misconduct occur.

Further, a violation of any rule adds to the penalty to be assessed for future violations even though different in nature.  Continuous violations of different rules will result in discharge.

---

[4] Joint Exhibit No. J-2:  Shop Rules and Regulations for ITT Corporation Engineered Valves, LLC for Hourly Employees.

These rules are to be used as a guide for employee conduct, but they do not restrict the Company from taking disciplinary action, including discharge, for reasons not stated, nor do they restrict the Company from adding to or deleting those listed.

Attendance issues will be addressed per the Hourly Attendance Policy.

### **Minor Acts**

Discipline:

| | |
|---|---|
| First Offense – | Verbal warning |
| Second Offense – | Written warning |
| Third Offense – | Three scheduled workdays or 24 hours off without pay |
| Fourth Offense – | Five scheduled workdays or 40 hours off without pay |
| Fifth Offense - | Discharge |

. . .

### **Major Acts**

Discipline:

| | |
|---|---|
| First Offense - | Forty hours (1 week) off without pay |
| Second Offense - | Discharge |

Whenever there have been no major offenses against an employee for 24 months, the employee's record will be considered clear, insofar as major offenses are concerned.

. . .
4.   Threatening, intimidating or interfering with fellow employees' rights, or using abusive language.
. . .

### **Intolerable Acts**

Discipline -                    Discharge

. . .
3.   Immoral or indecent conduct
. . .

## C.  **ITT CODE OF CONDUCT**[5]

What Our Code Does

- Sets an expected standard of behavior for team members and all stakeholders while at work.

- Guides our decision making.

Who Must Follow the Code?

---

[5] Joint Exhibit No. J-4:  How We Work Together (The ITT Code of Conduct), June 2019, for ITT employees corporate wide.

- ITT team members (full-time and part-time employees and temporary workers) worldwide, in cooperation with local works councils and bargaining units, as applicable.

How To Use the Code

- Read the Code and refer to it often – whenever you need help making a business decision or need additional guidance.  It is up to each of us to know and follow the Code, participate in all training and ask questions anytime something is unclear.  If a local law or custom ever conflicts with our Code, always apply the higher standard of ethical behavior.

Prevent Retaliation

- Never retaliate or permit retaliation by others against someone who has made a report in good faith.  Protect all team members by watching for signs of retaliation and reporting the behavior.

Violations

- When behaviors conflict with our Code, our policies or applicable laws and regulations, they violate our Principles.  Violations can result in disciplinary action – up to and including termination of employment . . .

Harassment-free Workplace

- Stay alert to and do not participate in:
  - Harassment – aggressive pressure and intimidation, which can be verbal, physical or visual.  It includes bullying, racial slurs, and inappropriate jokes as well as posting or sharing statements or images that individuals may find offensive.

### D.  HARASSMENT, DISCRIMINATION AND RETALIATION PREVENTION POLICY[6]

a. OVERVIEW

b. PURPOSE

This Policy defines the types of behavior which may constitute prohibited harassment, discrimination and retaliation . . . .

ITT does not tolerate and prohibits any form of harassment, discrimination or retaliation of or against . . . employees by another employee, supervisor, . . . on the basis of any characteristic protectable under or any applicable federal, state, country or local laws or ordinances.  In the United States, the protectable characteristics include: race, . . . national origin, ancestry . . . .  ITT is committed to a workplace free of harassment, discrimination and retaliation.

c. SCOPE

This Policy applies to all employees of ITT, its subsidiaries and divisions, all Value Centers and all programs and affiliated operations, worldwide.

1.4  KEY TERMS

**Harassment** – Unwelcome verbal, visual or physical conduct which results in an intimidating, hostile, or offensive work environment.  Harassment may encompass a broad range of physical,

---

[6] Employer Exhibit No. E-2:  Harassment, Discrimination and Retaliation Prevention Policy, dated August 31, 2016.

written, electronic, or verbal behavior that includes, but is not limited to, the following types of conduct or communication that denigrates or shows hostility or aversion towards an individual because of any protected characteristic:

- o   Display of offensive materials (offensive posters, symbols, cartoons, drawings, computer displays or emails)

2.0  POLICY

It is the policy of ITT, to provide each employee with a work environment free from intimidation, harassment, discrimination and retaliation.  ITT will not tolerate harassment, discrimination, retaliation, or impermissible behavior among it employees. . . .

**ALL HARASSMENT, DISCRIMINATION AND RETALIATION IS UNACCEPTABLE IN THE WORKPLACE AND IN ANY WORK-RELATED SETTING SUCH AS BUSINESS TRIPS AND BUSINESS RELATED SOCIAL FUNCTIONS, REGARDLESS OF WHETHER THE CONDUCT IS ENGAGED IN BY A SUPERVISOR, CO-WORKER, CLIENT, CUSTOMER, VENDOR OR OTHER THIRD PARTY**.

4.0  INVESTIGATIVE PROCEDURES

Upon receiving a complaint ITT will promptly conduct a full and thorough investigation into the facts and circumstances of any claim of a violation of this Policy.  To the extent possible, ITT will endeavor to keep the reporting [of] employee's concerns confidential; however, complete confidentiality may not be possible in all circumstances.

During the investigation, ITT generally will interview the complainant and the accused, conduct further interviews as necessary and review any relevant documents or other information.  Upon completion of the investigation, ITT shall determine whether this Policy has been violated based upon its reasonable evaluation of the information gathered during the investigation.  However, ITT will tailor its investigation as it deems appropriate under the circumstances.  ITT will take corrective measures against any person who it finds to have engaged in conduct in violation of this Policy, if ITT determines such measures are necessary.  These measures may include, but are not limited to, counseling, suspension, or immediate termination.  Anyone, regardless of position or title, whom ITT determines has engaged in conduct that violates this Policy will be subject to discipline, up to and including termination.

## POSITION OF THE PARTIES

**Employer Position**.  The Employer contended that it had just cause for the termination of Wood.  The Employer properly enforced the rules and regulations of the shop among them – Shop Rules and Regulations (Joint Exhibit No. J-2), Harassment Discrimination and Retaliation Prevention Policy (Employer Exhibit No. E-2), ITT Code of Conduct (Joint Exhibit No. J-4). Each contains penalties for violations up to and including termination for offenders.

The Employer's Human Resources Director, Jason Greenwood ("Greenwood") initiated an investigation into the matter on June 10th, the day he was advised of its occurrence by the

ITT EV Safety Manager, Chris Eberly.  Greenwood's investigation included interviews with a number of ITT EV employees.  Greenwood took notes of each meeting and then prepared a typewritten summary of each interview.  Of significance, was the following:

A.  Travis Joseph (fellow Lean Technician) observed Wood writing on his mask but could not identify what he wrote.

B.  Tim Donnelly (fellow Lean Technician and employee who was advised by Bhaila to wear his mask over his nose and mouth) stated that during the brief conversation on June 9th with himself, Bhaila, and Wood, that Bhaila did not say anything derogatory to Wood.

C.  Brad Myers (former 2nd Shift Supervisor) stated Wood was yelling and dropping "F-Bombs" in the polishing area following his interaction with Bhaila on June 9th.  He also stated that Wood's mask had the work "Fuck" on it but that he couldn't read the rest of what was on the mask.  Myers allegedly asked Wood what he'd like to see as a result of the incident, and Wood allegedly replied, "A one-on-one meeting with Kadeem [Bhaila] with no consequences."

D.  Grievant Douglas Wood who admitted during his June 17th interview with Greenwood and Production Manager Kerry Smith that he had written "Fuck Sri Lanka" on his mask because he was angry with Bhaila for not respecting his military service.

Because of Wood taking leave for a couple days and the inability (due to Bohan's sick leave) to have Local Union President Bohan join the interview, Wood was not able to interview Wood until June 17th.  That same day, the Employer suspended Wood citing violations of the Shop Rules and Regulations (Joint Exhibit No. J-2) and the ITT Code of Conduct (Joint Exhibit No. J-4) and citing in the Disciplinary Action Notification (Joint Exhibit No. J-3), "We are suspending Doug, pending corporate review of the incident."  ITT officials then met, and on June 23rd, decided to terminate Wood's employment with ITT EV and so advised him on that date.  The ITT officials believed Wood's actions constituted "immoral or indecent" conduct necessitating discipline up to and including discharge along with his violation which they also

14

reasoned violated the "Unlawful Harassment" portion of the Shop Rules and Regulations (Employer Exhibit No. E-2) as well as the Harassment, Discrimination and Retaliation Prevention Policy (Joint Exhibit No. J-4).

Further, Wood had acknowledged receipt of the Code of Conduct on May 14, 2018, at the time of his employment and was responsible for reading and applying this Code in his work.[7] Wood also acknowledged his receipt of training on December 4, 2019, with respect to both the Code of Conduct and Harassment Prevention training conducted by Greenwood.  The Union grieved Wood's termination, but the Employer denied the grievance citing its rationale for the terminating Wood and providing its definitions for the first time of "immoral" and "indecent."

Kadeem Bhaila, the ITT EV Site and Operations Manager also testified during the proceedings.  He testified that his country of origin was Sri Lanka and his race is Asian.  He testified as to his involvement with the ITT officials reviewing the "suspension pending corporate review" and his participation in the decision to terminate Wood's employment for cause.  Bhaila testified that he did not file a complaint against Wood as he believed the termination of Wood was not about him, but was about Wood's creation of a hostile environment based on factors like race, ethnicity, natural origin, etc. in violation of the Employer's policy with respect to discrimination and/or harassment.

In its brief, the Employer also cited the testimony of Local Union President Brendan Bohan ("Bohan') and the Grievant, Douglas Wood ("Wood").  On cross examination, Bohan testified that Article 6 provisions for issuing and making the termination effective within five (5) business days was a guideline and could be extended for extenuating circumstances.  Bohan also testified that he asked Greenwood to delay any final action until he (Bohan) could talk with Greenwood's supervisor.  He also testified that as Local Union President he is typically present for an investigative interview with an employee before that employee is terminated.  Bohan also testified regarding past disciplinary actions involving terminations for like offenses.

---

[7] Wood's acknowledgement of receipt of  the ITT Code of Conduct is contained in Employer Exhibit No. E-1, and signed and dated on May 14, 2018.

During his interview with Greenwood, Wood testified that he had received the ITT Code of Conduct and acknowledged that violations of the Code could result in termination. He also admitted to receiving training on ITT's Code of Conduct and Harassment Prevention. He likewise admitted to writing "Fuck Sri Lanka" on his mask and wearing the mask for a period of time.[8]

The Employer summed up its position in believing it uncontroverted that Wood engaged in racist, vulgar, extreme and offensive conduct in violation of the Employer's rules and regulations and that he was well aware that violation of each of these rules/regulations could result in his discharge. The Employer goes on to cite a number of prior arbitration cases and court decisions that uphold termination for harassment/discrimination offenses similar to Wood's alleged offenses.

The Employer contends that the facts are clear and that Wood was properly terminated for his offenses and that the Arbitrator should not substitute his judgement for that of ITT but should uphold the termination of Wood.

**Union Position**. The Union put forth a number of issues that it believed invalidated the just cause termination of Wood. Below is a summary of those issues.

The CBA provides for termination of ITT EV employees for Cause (Just Cause). The Union argues there was no just cause in the instant matter as a primary tenant of Just Cause is to follow the provisions of the negotiated CBA. In the instant case, the CBA provides for disciplinary actions being effective within five (5) working days following an investigation or circumstances or breach of discipline. In the instant matter, the incident occurred on June 9, 2020, but the termination decision was not issued and effective until June 23, 2020.

---

[8] The Company asserted in its post-hearing brief that he admitted to wearing the mask for 20-30 minutes for viewing by his co-workers. However, in his testimony, Wood admitted to wearing the mask for 10-15 minutes and only in his personal work area. The fact that no one other than supervisor Brad Myers actually saw the work "Fuck" on Wood's mask seems to suggest that Wood did not parade around the workplace displaying his mask for all co-workers to see, as claimed by the Employer.

Additionally, according to the Union, during the Employer's third step grievance response on July 17, 2020, the Employer added to the list of alleged disciplinary infractions "sexual and other unlawful harassment."  The Union also believed that in such an instance as alleged unlawful conduct, the quantum of proof should be elevated from a "preponderance of the evidence" to "beyond a reasonable doubt."  Further, the Union contended that the Employer must prove not only the alleged misconduct but also prove that the penalty imposed was justified by the circumstances of the case.

The Union also believed that the disciplinary history within ITT EV showed that other employees were not terminated for a single infraction and were charged with a Major Acts violation for harassment, not an Intolerable Acts violation as was the case with Wood.  Thus, the Union believes there was disparate treatment in Wood's case.[9]

Added to the above, the Union contends the Employer elevated the discipline at least two times – from counseling by Myers, to suspension, and lastly to termination.  The Union avers that Wood was subjected to double jeopardy by the Employer elevating the discipline twice against Wood.  The Union also believes Greenwood's interview notes should not be admitted into evidence since the Union was not given the opportunity to cross-examine any of the employees interviewed by Greenwood.

The Union believes that the Unemployment Compensation denial by the PA Department of Labor should not be admitted into evidence and used to support Wood's termination as the two entities – ITT EV and PA Department of Labor – use different standards.  Further, claims for unemployment compensation have no bearing on arbitration decisions as unemployment compensation decisions are not tied to or controlled by contractual agreements between ITT EV and its Union.

With respect to the charge of unlawful harassment, Bhaila did not file a complaint about Wood's actions and the Union observed that Bhaila testified that he did not feel personally

---

[9] The case of the termination of John Kise (Union Exhibit No. U-2) was identified as the case where Kise was terminated for a second major acts violation, not a single Intolerable Act, as was the case with Wood.

harassed because nothing was said directly to him, and he did not see the writing on the mask. The Union contends that proof of unlawful harassment is a two-fold obligation.  First, the Employer must prove the Grievant's conduct had been directed at Bhaila based on a characteristic that is protected by anti-discrimination law, and secondly, the Employer must prove that the behavior negatively affected Bhaila's working conditions and/or his terms of employment.  While the first may have been proved, certainly there was no proof of the second Employer obligation.

The Union further takes issue with the charge of Intolerable Acts as they had not been defined except to say immoral or indecent conduct, neither of which was further addressed.  The Union also asserted that both Bohan and Wood, during their testimony advised they had never seen Employer Exhibit No. E-2.  Even if they had, the document does not indicate that termination is the result of a violation, but that discipline is not limited but could subject violators to discipline, "up to and including termination."

It is the Union's contention that the grievance must be upheld and the Grievant be made whole with interest awarded on monies, including benefits and overtime, at the applicable rate of pay.

## DISCUSSION

The details surrounding the incident occurring at ITT EV involving the Grievant Douglas Wood are amply put forth above.  However, there are a number of issues raised by the parties to support their contentions which will be addressed in this section of the Award.

A.  **Admissibility of Contested Evidence**.  The Union raised the issue of admissibility concerning (1) the ITT Corporate Policy on Harassment, Discrimination and Retaliation Prevention (Employer Exhibit No. E-2); (2) the interview notes of HR Manager Greenwood (Employer Exhibit No. E-4); and (3) the PA Department of Labor's unemployment compensation decision regarding Wood (Employer Exhibit No. E-5).

With regard to the Union's objection to the admission of Employer Exhibit No. E-2, the ITT Corporate Policy on Harassment, Discrimination and Retaliation Prevention, the Grievant admitted that he had attended training on the ITT Code of Conduct as was indicated in Employer's Training Report attendance sheet (Exhibit No. E-3), dated December 4, 2019.  HR Director Greenwood testified that he provided that training to Wood which covered both the ITT Code of Conduct and Harassment Prevention training.  The Employer also entered into evidence Employer Exhibit No. E-1, the ITT Corporation Code of Conduct which Wood, on May 14, 2018, acknowledged receipt of either a hard copy of the document or internet access to it and, by his signature, agreed the document contains important information, which he was responsible for reading and operating under as an ITT employee.  Further, Joint Exhibit No. J-4, the ITT Code of Conduct addresses a harassment-free workplace and cites that violations may result in disciplinary action up to and including termination.  According to the uncontroverted testimony of Greenwood, a copy of the Code is provided to employees on their first day of employment along with training on the matter.  Based on the above information, I have determined that Employer Exhibit No. E-2, the ITT Corporate Policy on Harassment, Discrimination and Retaliation Prevention is properly entered into evidence.  Whether or not Wood saw the actual document, he was well aware, through his training at ITT EV and by related documents/exhibits he did review and was trained on, that ITT required a harassment-free workplace and that violations could result in termination.

With regard to HR Manager Greenwood's notes (Employer Exhibit No. E-4), I also accept the interview notes into evidence.  While the Union claims that the contents are hearsay as it is Greenwood's summation of the witnesses' comments, I accept the interview notes as proper evidence obtained in an impartial investigation by management.

With respect to the Union's objection to Employer Exhibit No. E-5 (the PA Department of Labor and Industry's Notice of Determination on Wood's claim for unemployment compensation), I support the Union's contention that the Department's denial of benefits has no bearing on the Wood's grievance.  I had admitted the document into evidence but indicated at the hearing it would have little if any probative value.  I have not used that document or

testimony about the denial of unemployment compensation in my consideration of Wood's termination.

B. **Quantum of Proof**.  The Union believes that because of the Employer contending there was a charge of unlawful harassment, the quantum of proof should be elevated from a preponderance of the evidence to evidence beyond a reasonable doubt.  Elkouri and Elkouri in How Arbitration Works (8th edition) cites that most arbitrators apply the preponderance standard in ordinary discipline and discharge cases, but in cases involving criminal conduct or stigmatizing behavior, many arbitrators elevate the standard to "clear and convincing evidence." Normally, the higher standard is used where the alleged conduct is the kind recognized and punished by criminal law.  I, like many arbitrators, use the common-sense requirement that the arbitrator must be completely convinced of the Grievant's guilt in the matter.

C. **Grievant's Awareness of Policies and Standards**.  There is no doubt with the documents provided to, and the training conducted for, new ITT employees that they are aware of the policies regarding harassment and discrimination.  I find this is likewise true for Wood.

D. **Discrimination, Harassment and Threats of Bhaila**.  The Employer characterized Wood's actions in writing "Fuck Sri Lanka" as engaging in "racist, vulgar, extreme and offensive conduct" directed at Bhaila.  I agree that the conduct was very unprofessional and improper.  The Employer also believed that Wood displayed the mask to co-workers and threatened a manager from Sri Lanka.  Wood testified that he wrote the words on the mask, but that he did not parade around the office "showboating" the mask, but stayed in his work area and wore the mask for about 10-15 minutes.  Also, Bhaila was not shown the mask, never saw it, and only learned about it a day or two after the incident.  Later when supervisor Brad Myers had called Wood into his office and calmed him down, he asked Wood what he would like, and Wood allegedly replied, "A one-on-one meeting with Kadeem [Bhaila] with no consequences." Truthfully, I do not view this response to a supervisor's question as a threat toward Bhaili.  To me, the threat would be Wood talking directly to, or writing directly to, Bhaila, and telling him,

"I will kill you," or "I will beat your ass the next time I see you off the ITT premises."  These are true threats – quite unlike responding to a supervisor's question of what Wood would like to see.

Further, with respect to the harassment/discrimination charge, no question but that Wood's actions were totally improper, but I do consider the Union's contentions to be valid. Bhaila did testify that he did not feel personally harassed and did not see the writing on the mask.  His concern was that Wood was creating a hostile environment so I don't see harassment of Bhaila as definitive.  Also, the Union pointed out that proof of harassment is a double-edged sword – the conduct toward Bhaila must be based on a characteristic that is protected by anti-discrimination law <u>and</u> the behavior must negatively affect Bhaila's working conditions or his terms of employment.  While the first condition was met; the second was not.  Thus, I do not believe Wood's actions were a case of pure harassment or discrimination under the law and did not serve as a threat to Bhaila.

   **E.  <u>Alleged Timelines Violation and Improper Elevation of Discipline</u>**.  The Union charged that the Employer violated the Collective Bargaining Agreement when it took 14 days from the time of the incident until the discharge was effective.  Article 6, Sections 4 and 5 address timeliness and require that the disciplinary actions be in writing and given to the employee and the Union within five (5) working days of the disciplinary action and that the discipline will be effective within five (5) working days following an investigation unless extenuating circumstances require additional time.  The Union claims the Employer never asked for additional time.  However, Wood took two (2) working days off immediately after the incident.  Then, Local Union President Bohan requested that he be able to talk with HR Manager Greenwood's supervisor (Steve Haddad), and then Bohan himself was on leave for an additional day.  Thus, the five (5) day time limit was missed by a couple days, but primarily because of the Grievant's leave and the local president's request to speak with Haddad plus his day of sick leave in the intervening time.  I consider these to be extenuating circumstances and will not overrule the discipline on the basis of a missed deadline.

The second issue relates to the Union's charge that the Employer elevated the discipline twice – from counseling, to a suspension and then to discharge.  First, I find that supervisor Brad Myers who calmed Wood down and spoke with him regarding the incident had no authority to discipline Wood, and his counseling (speaking with Wood) did not constitute a first disciplinary action.  Secondly, when HR Manager Greenwood had completed his investigation of the matter, the Employer developed and issued Wood a suspension action "pending corporate review."  Thus, I do not view the suspension as a *fait accompli* at that time as the corporate review was still required by the Employer.  Following the corporate review about six days later on June 23, 2020, the corporate review resulted in the discharge action.  I do not view the corporate policy as an impediment or as an improper act when through corporate review the penalty was increased to termination.  There was never an indication in the first Notice of Violation that the suspension would be for a particular period of time such as a one week or 60-day suspension, but it was an indefinite suspension pending corporate review.  The corporate review would then determine the length of the suspension or whether the facts determined the suspension should become a termination, a one-week suspension, or a lesser punishment.

**F.   Past Practice and Alleged Disparate Treatment.**   The Union claimed that Wood had no prior discipline on his record before the June 9, 2020 incident.  The Employer claimed otherwise and entered Employer Exhibit No. E-7 into evidence which was an Attendance Discipline Form, dated December 30, 2019, showing verbal counseling on that date for a "No Call No Show" incident occurring on December 26, 2019.  However, there was no indication that Wood had ever received a written reprimand, a short-term or long-term suspension, or any type of official discipline.  For purposes of consideration of Wood's disciplinary record, I consider his record to be clean of prior disciplinary actions prior to his termination action.

The Employer also entered Employer Exhibit No. E-6 into evidence which showed actions taken against three employees for offensive/inappropriate language.   The first was a probationary employee who was discharged for her offense.  The second was for the supervisor at the center of the Wood action, Brad Myers, who was discharged for discriminating against an employee with the charge having been brought to management's attention by Local Union

President Bohan.  Also, there was no indication as to whether this was a first, second or later offense.  The third disciplinary action was against another supervisor for disparate treatment.  The disciplinary action was counseling of the supervisor and a monitorship of the supervisor to show he held all employees accountable.

The Union introduced two prior grievance actions – Union Exhibit No. U-4 (Derek Allison grievance in late 2018) and Union Exhibit No. U-2 (John Kise grievance in 2009).  In U-4, Derek Allison ("Derek") was given a written warning and suspension pending EAP consultation.  Following the EAP consultation Derek was returned to work with the suspension being expunged from his work record.   The warning was given for what was described as a minor act when Derek prepared a drawing on his work apron and admitted the circular drawing he made on the face were "wounds."   Out of concern for both Derek and his co-workers, management made him undergo the mandatory EAP evaluation.  As previously indicated, Derek was permitted to return to work with the infraction remaining on his work record for a 12-month period and a notation that any further infraction within the next 12 months would result in "progressive discipline up to and including termination."  In the management response to the Union grievance, management admitted it removed Derek from work and suspended him from work due to the disturbing drawing he made on his apron which indicated potential violence.  However, following the EAP evaluation, Derek was returned to work and his suspension was expunged from his work record.

The second prior disciplinary action introduced by the Union was the John Kise ("Kise") grievance in 2009.  Kise, like Wood, was a Lean Technician for ITT EV.  Kise's Notification of Disciplinary Action (Union Exhibit No. U-2) cited his having been counseled on multiple occasions regarding his behavior and attitude toward other employees.  Regarding the triggering event which occurred in December 2008, Kise had been noted as having disputes with another employee and Kise was ordered to stay away from the other employee and not talk to him (unless it regarded work) and he failed to do so.  Management then charged Kise with a Major Acts violation of Major Acts 1 & 5. And was issued a one-week suspension in accordance with Shop Rules and Regulations under Major Act for a first offense.  This was in 2008.  Then a year

later, in late 2009, Kise was again charged with a Major Acts violation of Major Acts 5 when Kise called a co-worker "nothing but a Puerto Rican nigger lover." Management considered Kise's actions to be disrespectful behavior and language using racial slurs. Management then cited Kise's prior disciplinary record (one-week suspension in 2008) and considered termination to be the next step in the disciplinary process and issued him a termination which was unsuccessfully grieved.

What is noteworthy is in the first case with Derek Allison management reduced its discipline and despite his violating an order of management, his initial suspension was expunged and only a written warning remained on his work record. In the second case, Kise had two major incidents not totally unlike the instant Wood case where he called a co-worker "nothing but a Puerto Rican nigger lover" whereas Wood did not call Bhaila anything but wrote on his mask, "Fuck Sri Lanka." To me, the Kise incident was the more egregious and was rightfully termed harassment whereas in Wood's case, Bhaila was unaware of the mask or the writing on it until advised a day or so after the incident. Also, in Kise's case, this was a second Major Offense whereas in Wood's case, management elevated the offense to an Intolerable Offense rather than a Major Offense. Although this was a first offense for Wood, he was terminated.

Also, management in its prior disciplines referred to its use of progressive discipline and showed progressive discipline in Kise's case where he was first given a one-week suspension for his first offense, and when he failed to learn his lesson, progressive discipline was used to terminate him for a second offense. The Employer also referred to progressive discipline in the Derek Allison case. Not so in Wood's case where for an offense considered by this arbitrator less egregious than the Kise second offense, he was not given progressive discipline but was terminated for the first offense. In summary, I do find disparate treatment in the handling of Wood's disciplinary action.

**G.  <u>Prior Arbitration Awards and Court Rulings.</u>**  The Employer, in its post-hearing brief, cited a number of different prior arbitration awards where arbitrators ruled management had just cause for their discharge of employees who called another employee "a stupid nigger" or a black employee who referred to her supervisor as "whitey" or where a non-white employee left a note containing a racial slur in a black employee's locker.  However, the details of these cases were not revealed as to the exact nature of the violations and the CBA provisions that were violated and whether they had language that characterized violations as minor, major and intolerable as was the case with the Wood termination.  Without such details, the simple act of recounting the decision of the prior arbitrators is of very little value.  Further, Bhaila did not refer to his supervisor as "Whitey," "Puerto Rican Nigger Lover," or "Stupid Nigger."  His message which the victim never saw was "Fuck Sri Lanka."  This does not mean to imply that such language is acceptable.  It is clearly not acceptable and as stated previously is unprofessional and inappropriate.

The Employer likewise cited several Court decisions.  However, like the prior arbitration awards, there was no detail cited along with the cases only a conclusion.  Of significance though is the Employer's citing of *Newsday, Inc. v. Long Island Typographical Union,* 915 F.2d §840 where the court found that harassing behavior violates public policy against harassment in the workplace.  Thus, an award of reinstatement where a finding of harassment took place prevents the employer from carrying out its legal duty to eliminate racial harassment.  Significantly, in Wood's termination case, there was no finding of harassment based on race.  Further, the Employer presented another arbitration award wherein Arbitrator Whitney McCoy contended an arbitrator should not substitute his judgement for the judgement of the Employer and that the only case where a penalty imposed by management can rightfully be set aside by an arbitrator is where there has been an abuse of discretion, which is what this Arbitrator has found in Wood's case.  Management abused its discretion and showed disparate treatment between the Kise discharge and Wood's discharge as explained above.

United Steelworkers, GMP, Local 36M                                          FMCS # 20-0722-08309
& ITT Engineered Valves                                                      Douglas Wood Termination

H. **<u>Summary</u>**.  Based on my finding of disparate treatment and past practice and what I consider to be a Major Acts Violation and not an Intolerable Acts Violation, I find Wood's termination to be improper as a penalty for a first offense.

## <u>AWARD</u>

The grievance is partially sustained and partially denied.  The Grievant's termination for an Intolerable Act will be substituted with a one-week suspension for a Major Act Violation. Back pay at straight time pay is awarded for all normally scheduled work (less the one-week suspension) between the time of initial suspension, June 17, 2020 and Wood's return to duty and less any other income earned by the Grievant during the period of his improper termination up until his return to duty provided such income was not a normal part of the Grievant's income prior to termination.  I will retain jurisdiction for the sole purpose of resolving any dispute/s over the remedy.

*W. W. Lowe*

William W. Lowe
Arbitrator

Dated:   December 28, 2020
         Red Lion, Pennsylvania