UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ITT ENGINEERED VALVES, LLC,<br>　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>UNITED STEEL, PAPER AND FORESTRY,<br>RUBBER, MANUFACTURING, ENERGY,<br>ALLIED INDUSTRIAL AND SERVICE<br>WORKERS INTERNATIONAL UNION,<br>AFL-CIO CLC, LOCAL 36M,<br>　　　　　　　　　Defendants. | :<br>:<br>:<br>:　No. 5:21-cv-00205<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**O P I N I O N**

**Plaintiff's Motion for Summary Judgement, ECF No. 12—DENIED**
**Defendants' Motion for Summary Judgment, ECF No. 16—GRANTED**

**Joseph F. Leeson, Jr.**　　　　　　　　　　　　　　　　　　　　　　　　**August 3, 2021**
**United States District Judge**

## I.　INTRODUCTION

In this case, Plaintiff ITT Engineered Valves, LLC ("ITT") seeks to vacate an arbitration award that concluded ITT had improperly terminated one of its employees, Douglas Wood ("Wood"), for discriminatory and harassing behavior towards a supervisor. The arbitration award was issued pursuant to the terms of a collective bargaining agreement ("CBA") between ITT and Wood's union, Defendant United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("the Union"). According to ITT, the arbitration award should be vacated as contrary to a well-defined public policy against discrimination and threats of violence in the workplace. Both ITT and the Union have cross-moved for summary judgment.

The scope of this Court's review of an arbitration award is necessarily constrained. Under this standard, ITT has failed to show that the arbitration award is inconsistent with a well-defined public policy, that it is entirely unsupported by the record, or that it reflects a manifest disregard of the CBA. Accordingly, ITT's motion for summary judgment is denied, and the Union's motion for summary judgment is granted.

## II.     BACKGROUND[1]

### A.     The CBA, the Underlying Conduct, and Wood's Termination

The Union represents certain ITT employees at an ITT facility in Rohrerstown, Pennsylvania. Defendant's Statement of Undisputed Material Facts ("Def.'s SOMF"), ECF No. 18, ¶ 1. ITT and the Union were parties to a collective bargaining agreement covering the period from May 20, 2017, to May 21, 2021. *Id*. ¶ 2. The CBA contained a grievance and arbitration procedure for resolving disputes between ITT and the Union relating to the interpretation or application of the CBA. *Id*. ¶ 3. The parties agreed in the CBA that "questions of interpretation, application, or claimed breaches of this agreement" not resolved through the grievance procedure could be appealed for resolution by an arbitrator. *Id*. ¶ 4. The CBA also provided that ITT may "promulgate and enforce reasonable plant rules and regulations" and "suspend or discharge for cause." *Id*. ¶ 5.

On June 9, 2020, Wood was employed by ITT as a Lean Technician at its facility in Rohrerstown, Pennsylvania. Plaintiff's Statement of Undisputed Material Facts ("Pl.'s SOMF"), ECF No. 22, ¶ 1. On that date, ITT's Site and Operations Manager, Kadeem Bhaila ("Bhaila"), who is originally from Sri Lanka, observed Wood conversing with another ITT employee whose

---

[1] The Court draws the following facts from the parties' factual statements and responses thereto, and generally cites to these statements rather than the underlying record, except where necessary for ease of comprehension and clarity.

face mask had been pulled down to expose his nose and mouth. *Id*. ¶ 2; Def.'s SOMF ¶ 17. Bhaila asked Wood's coworker to adjust his face mask to comply with ITT's COVID-19 policies concerning workplace safety. Pl.'s SOMF ¶ 3. Wood then interjected, advising Bhaila that he had served in the military and that he did not object to his companion's face mask being pulled down. *Id*. ¶ 4. Bhaila thanked Wood for his service, but again requested that face coverings be kept in place in order to abide by the ITT's safety protocols. *Id*. ¶ 5. Wood, who felt that Bhaila had belittled his military service, returned to his work booth and wrote "Fuck Sri Lanka" on his face mask. *Id*. ¶ 6; Def.'s SOMF ¶¶ 17-18. Upon discovering this behavior, Wood's immediate supervisor, Brad Myers ("Myers"), gave him a new mask to wear, after which Wood stated that he would like to have a "one-on-one meeting with [Bhaila] with no consequences"—a statement Myers perceived to be a threat against Bhaila. Pl.'s SOMF ¶¶ 7-9; Def.'s SOMF ¶¶ 26-27.

After this incident, Wood was suspended pending an investigation, after which ITT terminated his employment. Pl.'s SOMF ¶ 10; Def.'s SOMF ¶ 6. According to ITT, Wood's discharge was based on its determination that he had violated ITT's Shop Rules and Regulations—specifically, that his conduct constituted "immoral or indecent conduct" and was accordingly an "Intolerable Act" justifying termination under the Rules and Regulations—as well as ITT's Code of Conduct and its Harassment, Discrimination, and Retaliation Prevention Policy. Pl.'s SOMF ¶ 11; Def.'s SOMF ¶ 28. The Union thereafter challenged Wood's termination and pursued arbitration under the relevant CBA. Pl.'s SOMF ¶ 12.

B.     The Arbitration Award[2]

The parties participated in an arbitration hearing conducted by Arbitrator William Lowe on October 23, 2020. Def.'s SOMF ¶ 9. Arbitrator Lowe issued his twenty-six-page opinion and arbitration award ("the Award") on December 28, 2020. *Id*. ¶ 10.

In the Award, Arbitrator Lowe reproduced relevant portions of ITT's Shop Rules, which were offered by ITT and the Union as a joint exhibit at the hearing. *Id*. ¶ 11. In relevant part, the Shop Rules provide that "Major Acts" are punished by a forty-hour (one week) suspension for a first offense and discharge upon a second offense. *Id*. ¶ 12. The Shop Rules identify "threatening, intimidating, or interfering with fellow employees' rights, or using abusive language" as a Major Act. *Id*. ¶ 13. The Shop Rules provide for immediate discharge for an "Intolerable Act." *Id*. ¶ 14. "Immoral or indecent conduct" is identified in the Shop Rules as an Intolerable Act. *Id*. The Award also reproduced ITT policy on harassment, which provide that "ITT will take corrective measures against any person who it finds to have engaged in conduct in violation of this Policy, if ITT determines such measures are necessary. These measures may include, but are not limited to, counseling, suspension, or immediate termination." *Id*. ¶ 15.

Arbitrator Lowe noted that Wood stated he had felt that Bhaila had belittled his military service at the time of the incident, in response to which Wood wrote "Fuck Sri Lanka" on his face mask. *Id*. ¶¶ 17-18. Arbitrator Lowe further noted that Wood testified that he wore the mask for only ten to fifteen minutes, and that nobody but supervisor Myers saw the message on the mask. *Id*. ¶¶ 19-20. Bhaila never saw the mask and only learned about it a day or two later.

---

[2]     The Court by and large adopts the summary of the Award as set forth in the Union's Statement of Undisputed Material Facts, as ITT does not dispute this summary and ITT's own Statement of Undisputed Material Facts does not address the majority of the Award's findings. In any event, there can be no dispute as to the content of the Award, its findings, and its conclusions.

*Id*. ¶ 21. Bhaila did not lodge a harassment complaint against Wood and testified that he did not feel personally harassed as a result of the incident. *Id*. ¶ 22. Wood testified that he subsequently apologized to Myers and to Bhaila. *Id*. ¶ 25. Arbitrator Lowe found that while Wood's conduct in writing "Fuck Sri Lanka" on his mask was "very unprofessional and improper," it did not negatively affect Bhaila's working conditions or terms of employment, as Bhaila did not even see the writing on the mask and did not feel personally harassed. *Id*. ¶¶ 29-31.

The Award also recounted the testimony of ITT Human Resources Manager Jason Greenwood ("Greenwood"), who had interviewed Myers as part of his investigation into the incident. *Id*. ¶ 23. According to Greenwood's account of Myers's recounting, Myers saw the mask on June 9, provided Wood with a new one, and took Wood into his office. *Id*. ¶ 24. Myers told Greenwood that he had asked Wood what Myers could do to make Wood feel better, and that Wood had replied "[a] one-on-one meeting with [Bhaila] with no consequences." *Id*. ¶ 26. The Award noted that while ITT characterized this statement as a threat against Bhaila, Wood testified that he had not intended to make any threat. *Id*. ¶ 27. Arbitrator Lowe stated that he did "not view this response to a supervisor's question as a threat toward Bhaili." *Id*. ¶ 32. Arbitrator Lowe also considered and rejected ITT's argument that the public policy against racial harassment would conflict with any award reinstating Wood. *Id*. ¶ 42. Specifically, Arbitrator Lowe considered and distinguished *Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840 (2d Cir. 1990), stating "significantly, in Wood's termination case, there was no finding of harassment based on race." *Id*. ¶ 43.

Arbitrator Lowe also concluded that Wood was treated differently from two other employees who had not been discharged for a first offense of conduct similar to ITT's allegations against Wood. *Id*. ¶ 35. Specifically, in 2018, employee Derek Allison ("Allison")

drew a face with "wounds" on his work apron. *Id*. ¶ 36. Due to this indication of potential workplace violence, ITT initially suspended Allison, but this was reduced to a written warning following an Employee Assistance Program evaluation. *Id*. ¶ 37. The Arbitrator also examined the 2009 case of John Kise ("Kise"). *Id*. ¶ 38. Kise was charged with a Major Violation for calling a co-worker "nothing but a Puerto Rican n***** lover." *Id*. ¶ 39. Because Kise had a previous Major Violation in 2008 for disputes with another employee, progressive discipline was applied, and ITT discharged Kise for this second Major Violation. *Id*. ¶ 40. The Award concluded that ITT had applied disparate treatment in the disciplining of Wood—who had a clean disciplinary record prior to the incident—relative to these two previous cases.[3] *Id*. ¶¶ 16, 41.

In the end, Arbitrator Lowe found ITT's termination of Wood to be improper: "Based on my finding of disparate treatment and past practice and what I consider to be a Major Acts Violation and not an Intolerable Acts Violation, I find Wood's termination to be improper as a penalty for a first offense." *Id*. ¶ 44. The Award partially sustained and partially denied the grievance, stating that "the Grievant's termination for an Intolerable Act will be substituted with a one-week suspension for a Major Act Violation." *Id*. ¶¶ 45-46. The Award further ordered ITT to return Wood to duty and compensate him for back pay for all normally scheduled work (less the one-week suspension) between the date of Wood's initial suspension and the date of his subsequent return to duty. *Id*. ¶ 47.

---

[3]  In its Statement of Additional Material Facts, ITT states that Kise was terminated before ITT had amended its Shop Rules and issued its Code of Conduct and Harassment and Discrimination Policy, each of which provides for the immediate termination of an employee who harasses a coworker based on a protected classification. *See* ECF No. 23-1, ¶¶ 5-7.

### C. The Instant Litigation

#### 1. *ITT's Challenge to the Award*

ITT seeks to vacate the Award on the grounds that it contravenes well-defined public policy related to workplace conduct. ITT avers that "there are two well-defined and dominant public policies that would be violated if the Award is enforced: (1) the public policy against racial/national origin harassment and discrimination, and (2) the public policy against threats of workplace violence." Plaintiff's Memorandum in Support of its Motion for Summary Judgment ("Pl.'s Mem."), ECF No. 12-1, at 6. In support of its argument regarding the existence of a strong public policy against racial/national origin harassment and discrimination, ITT points to the language of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act, Supreme Court precedent, and regulations promulgated by the Equal Employment Opportunity Commission. *See id*. at 6-8. In support of its argument regarding the existence of a strong public policy against threats of violence in the workplace, ITT points to the language of the Occupational Safety and Health Act and Pennsylvania law prohibiting "terroristic threats." *See id*. at 8-9. According to ITT, enforcement of the Award would violate these well-defined and dominant public policies.

ITT also argues that under Third Circuit precedent, "an arbitrator may not return an employee to work – *unless there is a determination on the merits that the employee did not engage in harassment.*" *Id*. at 11 (emphasis in original) (citing *Stroehmann Bakeries, Inc. v. Local 776, Teamsters*, 969 F.2d 1436, 1442 (3d Cir. 1992)). Additionally, according to ITT, "the Supreme Court of Pennsylvania [has] held that a finding of harassment in the workplace constitutes cause, and that discipline *must* issue." *Id*. at 12 (emphasis in original) (citing

*Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees*, 52 A.3d 1117, 1127-28 (Pa. Sup. Ct. 2012)).

Finally, in its reply in further support of its motion and opposition to the Union's motion, ITT argues that the Arbitrator's factual findings with respect to both disparate treatment and whether Bhaila had a subjective perception of Wood's conduct as harassment or discrimination, are contrary to the factual record, and are therefore deserving of no deference. *See* Plaintiff's Memorandum in Reply ("Pl.'s Reply"), ECF No. 23, at 8-11.

### 2. The Union's Opposition to ITT's Challenge

According to the Union, "[t]he public policy exception to the overall policy of deference to arbitration awards is 'narrow,' and [ITT] cannot show that public policy would prevent reinstating Wood." Defendant's Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem."), ECF No. 17, at 12 (quoting *Eastern Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 63 (2000)). Under the appropriate, narrow standard, the Union contends that "[t]he question for the Court is not whether Wood's conduct violated a well-established public policy. Rather, the relevant question here is [ ] whether the Award's order of reinstatement 'run [sic] contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?'" *Id*. at 12-13 (quoting *Eastern Associated Coal Corp.*, 531 U.S. at 62-63).

According to the Union, the answer to this question is no. With respect to ITT's arguments relative to a public policy against threats of workplace violence, the Union states that ITT has not produced a single case in which a court vacated an arbitration award because it reinstated an employee who made threats of violence. *Id*. at 13. To the contrary, the Union

8
080321

contends "many courts, including the Third Circuit, have rejected arguments that public policy forbade reinstatement of employees who had engaged in much worse conduct than Wood is alleged to have committed." *Id*.  According to the Union, it is moreover significant that the Arbitrator found that Wood's statement about a "one-on-one" meeting with Bhaila was in fact not a true threat—a factual finding to which this Court must defer. *See id*. at 14-15.

With respect to ITT's arguments relative to a public policy against racial or ethnic discrimination or harassment in the workplace, the Union contends "an isolated incident of inappropriate speech does not implicate public policy because it does not create a hostile environment." *Id*. at 16 (citations omitted).  Similarly, the Union states that "Arbitrator Lowe found that Wood's action did not create the subjective perception of an abusive environment necessary to constitute actionable harassment. The Supreme Court has made clear that 'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Id*. at 17 (quoting *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21-22 (1993)).  Finally, the Union contends even if Wood's conduct was sufficiently severe to implicate the public policy against workplace harassment and discrimination, the Award does not contradict or conflict with this policy, because the remedial action which the Award mandates—a week-long suspension—comports with public policy. *Id*. at 18-19.  According to the Union, "[p]ublic policy does not require the termination of employees whose actions create a hostile environment." *Id*. at 18.

In its reply memorandum, the Union contends that ITT's request for the Court to overturn the Arbitrator's factual findings, whether an explicit or implicit request, is unjustified, because these determinations have at least some support in the factual record. *See* Defendant's Memorandum in Reply ("Def.'s Reply"), ECF No. 24, at 2-3.  Lastly, the Union asserts that

contrary to ITT's contentions, there is nothing in either ITT's corporate policies, positive law, or public policy, which requires the termination of an employee who engages in an isolated incident or harassment or racist speech.  *See id*. at 3-6.

### III.   LEGAL STANDARD[4]—PRESUMPTION IN FAVOR OF ENFORCING ARBITRATION AWARDS

"There is a strong presumption under the Federal Arbitration Act ['FAA'] in favor of enforcing arbitration awards." *Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E.*, 817 F.3d 857, 861 (3d Cir. 2016) (quoting *Brentwood Med. Assocs. v. United Mine Workers of Am.,* 396 F.3d 237, 241 (3d Cir. 2005)).  "If a dispute-resolution mechanism indeed constitutes arbitration under the FAA, then a district court may vacate it only under exceedingly narrow circumstances." *Dluhos v. Strasberg*, 321 F.3d 365, 370 (3d Cir. 2003); *United Transp. Union Local 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379 (3d Cir. 1995) ("District courts have very little authority to upset arbitrators' awards.").  As the Supreme Court[5] has counseled, in order to resolve labor disputes "an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the

---

[4]     Although not addressed here, the Court applies the well-known Rule 56 summary judgment standard in its application of the substantive standard regarding challenges to enforcement of arbitration awards.

[5]     In *United Paperworkers*, the Supreme Court explained the basis for this extreme judicial deference to arbitrators' decisions as follows:

> The reasons for insulating arbitral decisions from judicial review are grounded in the federal statutes regulating labor-management relations. These statutes reflect a decided preference for private settlement of labor disputes without the intervention of government: The Labor Management Relations Act of 1947, 61 Stat. 154, 29 U.S.C. § 173(d), provides that "[f]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."

484 U.S. at 37.

arbitrator's interpretation of the contract. . . . [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987). Indeed, an arbitrator's "'improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." *Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 578 (3d Cir. 2005) (quoting *Major League Umpires Assoc. v. American League of Professional Baseball Clubs*, 357 F.3d 272, 279-80 (3d Cir. 2004)).

Circumstances that satisfy the "exceedingly narrow" standard so as to warrant vacatur of an arbitration award include the partiality or corruption of an arbitrator, or where an arbitrator "manifestly disregards, rather than merely erroneously interprets, the law." *Id.*; *see Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) ("It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." (quoting *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597 (1960))). Under an additional "exception to the general rule, a court may vacate an award if it violates a 'well defined and dominant' public policy, discerned 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291 (3d Cir. 1996) (quoting *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983)).

The "[a]pplication of the public policy exception requires a two step analysis. The threshold question is whether a well defined and dominant public policy can be identified. If so, the court must determine whether the arbitrator's award, as reflected in his or her interpretation

of the agreement, violated the public policy." *Id*. at 1291-92. However, "'[t]he public policy exception' to the enforcement of arbitration awards 'is slim indeed.'" *Suburban Transit Corp.*, 51 F.3d at 382 (quoting *Serv. Emps. Int'l Union Loc. 36, AFL-CIO v. City Cleaning Co.*, 982 F.2d 89, 92 (3d Cir. 1992)). "The exception is available only when 'the arbitration decision and award create an explicit conflict with an explicit public policy.'" *Id.* (quoting *Service Employees,* 982 F.2d at 92).

IV. **DISCUSSION**

For purposes of the instant litigation, the Court assumes that, as framed by ITT, there exist "well-defined and dominant" public policies against (1) threats of violence in the workplace, and (2) discrimination and harassment based upon race, ethnicity, and/or national origin. The Court will therefore focus its inquiry on whether enforcement of the Arbitration Award would "thwart the purpose" of either of these policies.

A. **Public Policy Against Threats of Violence in the Workplace**

Enforcement of the Award does not contravene or conflict with a public policy against threats of violence in the workplace, for two primary reasons.

1. ***Arbitrator Lowe determined Wood's conduct did not constitute a threat***

First and foremost, Arbitrator Lowe made a factual determination that the conduct ITT characterizes as threatening—Wood's stated desire to have a "one-on-one meeting with [Bhaila] with no consequences"—did not, in fact, constitute a threat. Specifically, while Arbitrator Lowe agreed that Wood's conduct in writing the at-issue statement on his face mask "was very unprofessional and improper," he concluded as follows with regard to Wood's "one-on-one meeting" comment:

> Truthfully, I do not view this response to a supervisor's question as a threat toward Bhaili. To me, the threat would be Wood talking directly to, or writing directly to,

>Bhaila, and telling him, "I will kill you," or "I will beat your ass the next time I see you off the ITT premises." These are true threats – quite unlike responding to a supervisor's question of what Wood would like to see.

Arbitration Award ("Award"), ECF No. 17-2, at 20-21.

Even if the Arbitrator's determination—that the single statement made by Wood to a supervisor, Myers, cannot be properly characterized as a threat against a *different* supervisor, Bhalia—was in this Court's view, incorrect, improvident, or so unfounded as to be deemed silly, the Court would not have the authority to vacate the Award on this basis. *See Metromedia Energy, Inc.*, 409 F.3d at 578; *see also Major League Umpires Assoc.*, 357 F.3d at 80 ("In reviewing an arbitration award, courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." (quotation marks omitted)). Vacatur of an award on the basis an arbitrator's factual determinations requires that there be "absolutely no support at all in the record justifying [those] determinations." *News Am. Publications, Inc. Daily Racing Form Div. v. Newark Typographical Union, Loc. 103*, 918 F.2d 21, 24 (3d Cir. 1990). In the Court's view, far from being improvident or silly—let alone lacking in any conceivable support in the record—there is sufficient support for the Arbitrator's determination that Wood's conduct cannot properly be considered a threat: Wood testified that he did not intend the comment to be a threat towards anyone, Award at 9; the comment was made not to Bhalia but to a third-party, *id*. at 14; and the comment is, on its face, ambiguous with no overt mention of violence.

Since the Court accepts Arbitrator Lowe's determination that Wood's comment was not a threat towards Bhalia, it necessarily follows that ITT's claim that the Award contravenes a public policy against threats of violence in the workplace fails: with no threatening behavior on Wood's

part, enforcing the Award and reinstating Wood to employment at ITT does not implicate, let alone conflict with, any such policy.

### 2. There is no public policy against threats of violence in the workplace which <u>requires</u> the discharge of an employee who engages in such conduct

Even if Wood's conduct was found to constitute a threat of violence towards Bhaila, ITT's claim that reinstatement of Wood would contravene a public policy against threats of violence in the workplace would still fail.  This is because, as far as the Court can discern, there is no public policy against threats of violence in the workplace *requiring* the discharge of an employee found to have engaged in such conduct.  On this point, the Third Circuit explained as follows: "[I]n [*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers*, 839 F.2d 146 (3d Cir. 1988)], despite recognizing that customer and co-worker safety may be valid public policy, we determined that 'a policy in favor of protecting co-workers and customers from [an employee's] violent conduct (assuming, *arguendo,* that such a policy is properly ascertained) does not *require* his discharge for its fulfillment.'"  *Suburban Transit Corp.*, 51 F.3d at 382 (emphasis in original) (quoting *Letter Carriers*, 839 F.2d at 149-50).  Rather, "[a] judgment about the offending employee's 'amenability to discipline' comes under the scope of the arbitrator's factfinding authority." *Letter Carriers*, 839 F.2d at 149 (citing *Misco*, 484 U.S. at 45).

Here, Arbitrator Lowe determined that under the circumstances of this dispute, Wood's conduct with respect to ITT's charge of a threat of violence against Bhaila was not in fact a threat, and did not warrant discharge.  Award at 20-21, 26.  The Award clearly, if implicitly, concludes that Wood, who had a clean disciplinary record prior to the incident and who expressed regret at his overall conduct afterwards, was amenable to discipline less consequential than termination.  *See id*. at 25-26.  This is a factual determination that is entitled to the

deference discussed at length previously, and one which does not conflict with a policy *requiring* termination of employees who are found to have exhibited threatening behavior—no such policy exists.[6]

### B. Public Policy Against Race, Ethnicity, and/or National Origin Discrimination and Harassment

Enforcement of the Award does not contravene or conflict with a public policy against discrimination or harassment based on race, ethnicity, and/or national origin, for reasons similar to those discussed in the preceding section of this Opinion.

#### 1. *Arbitrator Lowe determined Wood's conduct did not constitute discrimination or harassment*

ITT's claim that reinstatement of Wood conflicts with a public policy against discrimination and harassment is founded on Wood's actions in writing "F*** Sri Lanka" on his face mask. According to ITT, "where discrimination and/or harassment has been alleged, the arbitrator must reach a determination that such discrimination/harassment did not occur, prior to rendering a decision reinstating the employee to work." Pl.'s Mem. at 12. ITT bases this contention on *Stroehmann Bakeries, Inc. v. Loc. 776, Int'l Bhd. of Teamsters*, in which the Third Circuit stated as follows:

> Under the circumstances present here, an award which fully reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy. Therefore, Arbitrator Sands construed the Agreement between the parties in a manner that conflicts with the well-defined and dominant public policy concerning sexual harassment in the workplace and its prevention. His award would allow a person who may have committed sexual harassment to continue in the workplace without a determination of whether sexual harassment occurred.

---

[6]   *Cf. Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993) (explaining that in determining whether an award would conflict with public policy, a court may not "second-guess[ ] the arbitrator's fact-finding, particularly insofar as the conclusion that the asserted public policy would be violated by the employee's reinstatement depends on drawing factual inferences not made by the arbitrator." (quoting *Letter Carriers*, 839 F.2d at 148)).

969 F.2d 1436, 1442 (3d Cir. 1992).

Even if it is the case that *Stroehmann Bakeries* establishes a bright-line rule that where discrimination and/or harassment has been alleged, an arbitrator *must* reach a conclusion that such discrimination or harassment did not occur prior to rendering a decision reinstating the employee to work, and, even if *Stroehmann Bakeries* is sufficiently factually similar to the instant case to warrant analogizing—which, in the Court's view, is questionable[7]—that is precisely what Arbitrator Lowe did when he found as follows:

> [W]ith respect to the harassment/discrimination charge, no question [ ] that Wood's actions were totally improper, but I do consider the Union's contentions to be valid. Bhaila did testify that he did not feel personally harassed and did not see the writing on the mask. His concern was that Wood was creating a hostile environment so I don't see harassment of Bhaila as definitive. Also, the Union pointed out that proof of harassment is a double-edged sword – the conduct toward Bhaila must be based on a characteristic that is protected by anti-discrimination law and the behavior must negatively affect Bhaila's working conditions or his terms of employment. While the first condition was met; the second was not. Thus, I do not believe Wood's actions were a case of pure harassment or discrimination under the law[.]

Award at 21. Whether characterized as a factual determination, a legal determination, or a mixed determination of both, Arbitrator Lowe's finding—that "harassment of Bhaila" was not

---

[7] As the Union points out,

> [i]n *Stroehmann*, a delivery driver was accused of grabbing the breasts of the employee of a customer and making unwelcome sexual remarks to her. The arbitrator, an obvious misogynist, declined to make any findings as to whether the driver had committed the conduct, ignored the driver's testimony that he had asked the employee about her breasts, and emphasized the victim's social life and weight. He ordered the driver be reinstated with full back pay on the ground that the employer's investigation was insufficient.

Pl.'s Mem. at 19-20 (citations omitted). These facts are significantly distinct from the circumstances here—a single, isolated incident of a written profanity directed at a supervisor. What is more, the Court in *Stroehmann Bakeries* made clear that the facts underlying its holding are unique in beginning the consequential section of the Opinion with "[u]nder the circumstances present here." *Stroehmann Bakeries*, 969 F.2d at 1442.

"definitive," and that it is not the case that "Wood's actions were a case of pure harassment or discrimination"—puts the dispute to bed: Wood did not engage in harassment or discrimination under the law.  This determination is entitled to broad deference; in the absence of extreme circumstances, this Court does not have the authority to disturb it.  *See Metromedia Energy, Inc..*, 409 F.3d at 578; *Major League Umpires Assoc.*, 357 F.3d at 279-80; *Major League Baseball Players Ass'n*, 532 U.S. at 509.  Those circumstances are not present here.  Indeed, in the Court's view, far from being erroneous or improvident—which still would not permit this Court to vacate the Award—the Arbitrator's determination appears reasonable on its face in light of the underlying record.

Since the Court accepts Arbitrator Lowe's determination that Wood's conduct did not constitute harassment or discrimination under the law, it necessarily follows, as it does with regard to ITT's claims of Wood's threats of violence, that the Award does not contravene a well-defined public policy—here, a public policy against discrimination or harassment in the workplace.

> **2.** ***There is no public policy against discrimination or harassment in the workplace which <u>requires</u> the discharge of an employee who engages in such conduct***

Finally, even if Wood's conduct could be said to constitute discrimination or harassment based on race, ethnicity, or national origin, this Court would still lack the authority to vacate the Award.  As with ITT's claim that vacatur is required because Wood's comment to Myers constituted a threat against Bhaita, vacatur is not required on the basis of harassing or discriminatory behavior because there is no discernible public policy *requiring* termination of employees who engage in such behavior.  Rather, the Court agrees with the Union that the relevant precedents stand for the proposition that serious harassing or discriminatory behavior in

the workplace cannot go *un*punished.  *See Stroehmann Bakeries*, 969 F.2d at 1442 ("Under the circumstances present here, an award which *fully reinstates* an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy." (emphasis added)).  That is not what happened here—Wood received a one-week "Major Acts" suspension, *see* Award at 26; he was not "fully reinstated" without punishment.  Since there is nothing in public policy requiring ITT's termination of Wood's employment on the basis of Wood's allegedly discriminatory or harassing conduct towards Bhaila, ITT's arguments for vacatur of the Award on this basis necessarily fail.

## V.     CONCLUSION

According to ITT, "[i]t is difficult to comprehend the Arbitrator's reasoning, by which he deemed that the racial epithet emblazoned on [Wood's] face mask . . . to be something other than 'pure' harassment or discrimination, or the verbal threat uttered by [Wood] . . . to have been something other than a 'true' threat." Pl.'s Mem. at 13-14.  The Court understands ITT's desire to keep its workplace free of threats of violence and discriminatory and harassing conduct.  However, ITT's disagreement with the findings and conclusions reached by the Arbitrator are not a sufficient basis to warrant vacatur of the Arbitration Award.  Under the circumstances presented by the instant dispute, the Court lacks the authority to overturn the Arbitration Award which directs reinstatement of Wood after a one-week suspension.  For the reasons discussed

above, ITT's motion for summary judgment is denied, and the Union's motion for summary judgment is granted.

A separate Order follows this Opinion.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge
